Henry H. Anderson, Referee.
“ Theplaintiff, a bank organized in the city of New York, had a large number of customers who bought and sold gold, stocks, bonds and other securities, through the agency of the bank, the securities being kept by the bank to be used subject to the order of the customer. The entire charge of this business, the custody of the securities, purchase and sale of the stocks, and the correspondence with the customers in relation to the same, were entrusted to the cashier of the bank. Neither the directors nor any superior officer exercised any supervision over him ; he was left with unlimited authority to buy and sell, and with power to do whatever he pleased with the securities. He made his purchases and sales through the agency of *259 the defendants, who were brokers in Wall street. The purchases were made by him through the agency of the runners of the bank, those messengers who were in the habit of collecting and paying out whatever moneys were not collected or paid out over the bank counter, and the orders were transmitted through these runners, or stocks purchased or sold, as the case might be, and, when purchased, the same were paid for by the cashier’s check, that is to say, the check of the cashier drawn upon the bank itself.
“ The entries upon the books of the defendants were originally in the name of W. H. Sanford, cashier. After a while the word cashier was dropped in the ledger, although numerous purchases were entered in the blotter, the book of original entry, in the name of Sanford, as cashier, and carried forward to the ledger without the addition of,cashier. This circumstance, rather peculiar in itself, is not explained, the absence of explanation being accounted for by the death of the bookkeeper. Each one of the partners who is living denies that he had any knowledge of the books being kept in that way, and also swears that he knew of no transaction had with Sanford which was not believed by him at the time to have been on account of the bank.
“ In the summer of 1869, Sanford, the cashier, absconded, and it was found that he had absorbed or made way with, in some manner, the greater part of the securities which the bank was supposed to have on account of the various customers dealing with it in that behalf.
“ The president called upon the defendants, who showed him their books and accounts which they called the accounts of the bank with them, and he thereupon said that the cashier had no authority to act in respect of such matters as he had done.
“ The defendants, relying upon this statement, or upon the spur of this statement, immediately attached certain property of Sanford’s, found in New York, for the bal-. *260 anee of accounts then standing, upon their books, and recovered a portion of their claim by default out of the attached property. This suit was brought to recover the amount of certain of the cashier’s checks delivered to the defendants in payment for securities purchased, as money had and received to the use of the bank, and the plaintiff insists that the defendants are estopped to deny that this was the private account of Sanford, the cashier, by reason of their election to pursue Sanford in the attachment suit, and the plaintiff’s counsel has urged, with great ability and earnestness, numerous decisions bearing upon the subject of election, claiming that they establish the legal proposition maintained by him.
“I have made a very careful examination of these decisions, but cannot bring myself to agree with the plaintiff’s counsel that the proposition urged by him can be sustained, either upon principle or by precedent. The defendants, acting upon representations made by the plaintiff, balanced the account as it stood, and sued the cashier. It may very well be that having made this election to follow tlie cashier, the defendants could not maintain a suit against the bank for the same balance, but an election between two existing rights of action or remedies can hardly be construed as also establishing in favor of the other party a right of action which did not exist at the time the election was made, and which could only exist by reason of such election. At the time that the defendants brought this suit against Sanford the bank had no cause of action against them. Bringing such suit certainly did not create a cause of action. The case is an extraordinary one, and it seems strange that such large transactions could have been conducted so loosely, both on the part of the bank and on the part of the brokers ; but I think it is one of those cases where the plaintiff, by its own neglect, has justified the defendants in treating all the transactions with Sanford as conducted in behalf of the bank, and has relieved *261 them from any responsibility by reason of the misconduct of the plaintiff’s officer. The cashier’s checks were all honored. The defendants had no notice of the misappropriation of the securities belonging to the customers, and which were, perhaps, sold through their agency. The long course of recognition of the cashier’s checks on the part of the bank justified the defendants in believing that the drawing of such checks was known to, and authorized by, the plaintiff. I have, therefore, dismissed the complaint.”
Martin & Smith, attorneys, and George A. Strong of counsel, for appellant, argued:—
I. There is absolutely nothing in the alleged defences in this action. The defences attempted were three in number—estoppel, negligence, and payment. The latter may be summarily dismissed. Defendants sought to make out that Sanford had repaid to the bank all moneys which he abstracted by means of cashier’s checks. The referee found against that contention. In spite of his refusal, defendants insisted on inserting in the printed case the evidence upon this issue. Of course, they cannot retry it now. A respondent cannot urge on the appeal a point ruled against him on the trial. Hickey v. Taafe, 99 N. Y., 204, 210; Wangler v. Swift, 90 Ib., 44. A disposition as summary may be made of the defence of negligence. If defendants believed, and had reason to believe, that Sanford in all these transactions was acting for the bank, this, of itself, is a sufficient defence, and a further defence of negligence, if there be one, would be unnecessary. If, on the other hand, they knew that Sanford was really stealing bank moneys, then all the negligence in the world would not entitle them to collude with him in the operation and receive some of the moneys. It has never yet been held by any court that if A discovers that B’s employer is careless in the matter of supervision, he may co-operate with B in *262 robbing him. Indeed there is no hint of any such proposition in the referee’s findings. He limits himself to the fact of absence of supervision, but nowhere intimates that this constitutes a defence, and no such defence is pleaded. The defence, and the only defence which the referee sustains, is that of estoppel. In various forms he presents this proposition. As already suggested, it involves two entirely distinct propositions, both of which must be found for defendants or the defence fails, (a). Defendants believed that Sanford was acting for the bank. (b). This belief was justified by the bank itself. There was a complete failure to establish the other element of the estoppel, that the bank was responsible for this alleged belief that Sanford was speculating for it. Of course, this question is immaterial, if the evidence establishes that defendants, or their employes, knew that Sanford was speculating on his own. account. For in that case there is no effect, whatever the conduct of the bank might have justified them in believing. But this additional finding is indispensable to a successful defence. If defendants could convince the court that, in truth, neither they nor their agents knew or suspected what Sanford was really doing, but, on the contrary, honestly believed that he was speculating for the bank, it would avail them nothing, unless they could also show that they were justified by the bank in so believr ing. It is not pretended that the bank made any representations to defendants to this effect. On the contrary, it is expressly found that none of its officers ever met any of the defendants until after Sanford absconded. Defendants had only Sanford’s own acts and declarations as to his authority, which are, of course, wholly insufficient. Devens v. Mech’s, etc., Co., 83 N. Y., 171; Eaton v. Delaware, etc., R. R. Co., 57 N. Y., 390. But they say, as a last resort, these cashier’s checks were always paid by the bank. In other words, the success of Sanford’s scheme to defraud and rob the bank consti *263 tutes a reason why the moneys cannot be reclaimed. Let us see just what the situation was. The bank was accustomed to buy and sell securities for its correspondents. Such transactions were always for cash. It was the cashier’s duty to pay for the purchases, and that was the extent of his authority. It is evident that in the execution of this duty he would have frequent occasion to draw these cashier’s checks, and when they returned to the bank for payment they would, of course, be paid. They would then come into his possession, or that of clerks under him. This being so, he took advantage of his opportunity to draw and deliver to defendants the checks used in his speculations through them. They deposited these checks in their own bank, which sent them in through the Clearing House to plaintiff, and they were thus paid. This is all on which it has been held that plaintiff is estopped to complain of the robbery. It is, we submit, entirely insufficient. It is apparent that nothing about the check would show whether it was paid out in a legitimate or illegitimate transaction. The bank was constantly buying securities for its correspondents, and paying for them in these checks. Its cashier was the one who had charge of this business.- When one of these checks came in, if any of his superiors had seen it, instead of merely clerks under him, the natural presumption would be that it had been paid out in a proper transaction. There was absolutely nothing to show the contrary. The payment, therefore, of the checks was no ratification of his act in issuing them in such transactions. Ratification involves full knowledge of all material facts. King v. Mackellar, 109 N. Y., 223. Nor can the payment be claimed to have been a voluntary one, not to be recalled. That also requires full knowledge. Duncan v. Berlin, 60 N. Y., 154; Lake v. Artisans’ Bk., 3 Abb. Ct. App. Dec., 15. This defence also involves the claim, that the payment of these checks by the bank, which, in point of fact, did *264 not know that Sanford had used them in his own speculations, estops it from complaint as against defendants, who did know this fact. In other words, when it is defendants, who had the fullest knowledge, and plaintiff, who in its ignorance was being deceived and robbed, the latter must be held to be estopped, as against the former. Such an application of this doctrine of equity has not often been suggested.
II. Under the circumstances of this case the only possible defence would be to show that Sanford had actual authority from the bank for the transactions carried on in his name. We have tried, at some length, to show that even upon defendants’ theory the defence failed. We will now briefly indicate our contrary theory of the burden necessarily resting upon them. Sanford’s operations were speculations “ pure and simple,” as defendant Morris expressly admitted. The bank itself having no power to engage in such speculations, there could be no implied authority to Sanford to engage in them on its behalf. There can be no presumption that a corporate agent has a power not possessed by the corporation itself. Alexander v. Cauldwell, 83 N. Y., 485-6. Whoever seeks to hold one person for the acts of another must show the latter’s authority. Freedman, J., Dabney v. Stevens, 10 Abb. N. S., 44 ; affirmed, 46 N. Y., 631. That was an action stoutly litigated in this court, and which has since been often cited. No one will dispute the rule there laid down. Our present proposition, however, is that in the case at bar nothing will do hut proof of actual authority. It rests upon the uncontradicted fact that every entry relating to the checks in controversy represented the transaction to be for Sanford personally. Although on their face, therefore, they were Sanford’s transactions, defendants claim that the bank is to he responsible for them. In the nature of things there is but one way to make this out—to prove that in fact and in truth Sanford was acting for the bank. No *265 p.la.im of ostensible or apparent authority can be sustained. Every case of apparent authority involves: (1.) A false but deceptive appearance given to the act by the alleged agent. (2.) A reliance by the other party upon this outward appearance. Now in the case at bar there is no evidence that even Sanford ever professed to be speculating for the bank. And there is no appearance to that effect. The entries on their face constitute an appearance that the transactions were for Sanford. The defendants could not have relied upon any contrary appearance, for the good reason that there is no contrary appearance to rely upon. That left nothing, therefore, but the necessity of proving that Sanford had actual authority to speculate for the bank.
Edwards & Odell, attorneys, and Walter Edwards of counsel, for respondents argued :—
I. This action was originally brought for money had and received. The amended complaint charges further that the defendants have knowingly received plaintiff’s money from their cashier for and on account of his private and individual transactions. This contention is denied in the answer, and is completely controverted by the evidence. The referee has found the contrary as a fact. There is no question but the transactions, as first commenced, were for plaintiff’s account. The first transactions were in 1866. These were purchases and sales made over defendants’ counter, and no separate entry of them appeared on defendants’ books. Also let it be noted here that while the dealings began in 1866, the two earlier ledger accounts began November, 1867, and were ended by February, 1868, yet the checks upon which this action was originally predicated were drawn, two in May, 1868, and all the others in 1869. The accounts rendered by-the plaintiff under the order for discovery show that in the years 1867, 1868 and 1869, defendants received cashier’s checks drawn upon the plaintiff to the number *266 of one hundred, and aggregating about $500,000. This action seeks to recover upon fourteen of these checks which have been selected by plaintiff’s counsel after a careful and painstaking examination of all defendants’ books which he has been allowed to have in his own office for weeks for this purpose. It seems pertinent to ask by what possible means could defendants have been led to suspect that these fourteen checks were improperly issued -and the others rightfully. Where is the difference between these and the other eighty-six which is relied upon to charge these defendants with gross fraud in regard to these specified checks ? The general term of this court has held in this case that: “ The defendants dealing with the plaintiff had a right to assume that the cashier was acting under the plaintiff’s authority.” 37 N. Y. Superior Ct., 297.
II. The claim made in the seventh cause of action set forth in the complaint, in effect charges the defendants with gross frauds; no less a charge, indeed, than that they were conspirators with Mr. Sanford to defraud the bank. Such a charge should be proved beyond a peradventure. Fraud is never presumed. On the contrary, the legal presumption is, that every man, and particularly every official, does that which it is his duty to do. Rex v. Hawkins, 10 East, 211; Powell v. Millbourne, 3 Wilson, 355 : Hartwell v. Root, 19 Johns., 345 ; Bank of W. S. v. Dandridge, 12 Wheat., 69; Continental National Bank v. Koehler, 17 State Rep., 23 ; Spicer v. Spicer, 54 N. Y. Superior Ct., 280; Shultz v. Hoagland, 85 N. Y., 464; Bernheimer v. Rindskopf, 116 Ib., 428. The manner in which these dealings were conducted by the defendants repudiates all notion of fraud, conspiracy or knowledge of any wrong whatever, on the part of the defendants. All transactions were through the recognized messenger or runner of the Central National Bank, the plaintiff. All testimony agrees here, on behalf of defendants’ and plaintiff’s *267 witnesses, of two such runners, both well known in Wall street, or among banks and bankers, as being employed by plaintiff. All messages, orders and communications were through these persons. The checks received were immediately deposited and sent to the plaintiff in the usual, regular and best way. When Mr. Wheelock called on defendants every book was freely opened before him. There is no element indicative of fraud. No attempt at concealment of any kind. Only a dealing with a bank official, through the bank’s well-known clerks and in the exact line of the officers’ duty. Indeed, most of the dealings are confessedly for account of and acknowledged by the plaintiff—only fourteen out of a hundred checks are at all questioned.
III. Mr. Sanford was plaintiff’s agent. The charge of all securities left with the plaintiff,' selling such securities and purchases and sales of stocks, bonds, gold or securities for or on behalf of the bank or its customers, were confided to him and formed part of. his official duty. Defendants dealt with him as representing the plaintiff and had a right to do so. It is well settled that where one of two innocent parties must suffer by reason of the acts of a third person, the loss must fall upon the one who has enabled such third party to occasion the loss. Rawl v. Deshler, 4 Abb. Ct. of App. Dec., 12, and same case, 3 Keyes, 572; Armour v. Mich. Cent. R. R. Co., 65 N. Y., 111; Bank v. N. Y., L. E. & W. R. R., 106 Ib., 195. Plaintiff by placing Sanford in control of this part of its business put it in his power to do all he did. The defendants had all the dealings and received all the checks and paid out the money, relying upon the authority plaintiff had conferred upon Sanford. Plaintiff, whose agent Sanford was, and not defendants’, must bear the loss caused by his Avrong conduct. Such dealings on the part of a corporation have been repeatedly held as holding out their agents as fully authorized; and in such cases the *268 corporation is bound on the ground of implied authority. Hoyt v. Thompson, 1 Seld., 320; Lohman v. Erie R. R., 2 Sand., 39; Gillet v. Campbell, 2 Den., 520.
IV. This action, in form, is to recover for the plaintiff money had and received by defendants. In other words, to recover the amount of certain cashier’s checks drawn by Sanford and paid to the defendants. We allege that plaintiff has sustained no loss or damage by reason of said checks. Plaintiff’s contention is that Sanford misappropriated these checks, paid them to defendants for his own purposes, and that defendants, knowing that the checks represented the bank’s money, received them upon Sanford’s private account, and thereby plaintiff has suffered damage in their amount, which they ask to recover herein. Coles, plaintiff’s cashier, who succeeded Sanford, testified that all these checks were actually repaid to the plaintiff in money. Mr. Coles gives a detailed account of just how Sanford conducted his operations. He had charge of all bonds, stocks and securities left with plaintiff by its out-of-town customers. He sold these securities, and with the proceeds he made good his cashier accounts for all the cheeks he is alleged to have drawn improperly. The bank never sustained any loss until it met and paid the claim of these out-of-town correspondents for the securities so stolen by Sanford.
By the Court.—Gildersleeve, J.
The plaintiff, at the times hereinafter mentioned, was, and now is, a national bank, doing business in the city of New York. In June, 1866, William H. Sanford was its cashier, and continued as such until July, 1869. The defendants were, and now are, bankers and brokers in stocks and securities in this city. Between the dates above mentioned, plaintiff made purchases and sales of stocks securities and gold through the defendants. These dealings began prior to 1867 and continued until June, *269 1869; they were managed and directed by Sanford, plaintiff’s cashier, who gave all orders or directions to the defendants which were brought to defendants’ office by the clerks or messengers of the plaintiff. In the course of said dealings, defendants were constantly receiving cashier’s checks, being checks drawn by W. H. Sanford, Cashier, upon the plaintiff. The defendants received in such dealings upwards of one hundred of such checks, aggregating half a million of dollars. Those checks were immediately deposited by the defendants in their bank, and in the usual course of business presented to and paid by the plaintiff, through the clearing house. No question or objection to any of these checks was ever made until the commencement of this action. The plaintiff was in the habit of receiving from its customers stocks, bonds and securities, which were to be kept subject to their order. Such securities were in the custody and care of the cashier. On July 1, 1869, Sanford absconded. He had taken and appropriated to his own use all the stocks and securities. Subsequently the plaintiff was obliged to and did make good to its customers the value of such securities. All the cashier’s checks paid to the defendants were entered on the cashier’s account on the ledger of the plaintiff and on said account there were credits against each indicating that the same had been repaid to the plaintiff. These checks were all actually repaid to the bank, and Sanford’s cashier account was kept good. The account of these dealings on the books of the defendants was headed “ W. H. Sanford, Cashier,” at first; subsequently on the ledger the word “ Cashier” was omitted; one account was headed “ W. H. Sanford, stock account; ” one “ W. H. Sanford, gold account; ” and one account was headed “ Central National Bank.” All of the cashier’s checks paid to defendants were re-paid to plaintiff, either by those made against other parties or by moneys paid to plaintiff by Sanford. This action seeks to recover upon fourteen of *270 the checks out of the one hundred paid to defendants, as aforesaid, which have been selected by plaintiff’s counsel after an examination of defendant’s books. It is claimed by the plaintiff that the moneys represented by these cashier’s checks, so paid to the defendants, were for use in Sanford’s private stock speculations, and that defendants knew actually or constructively what Sanford was doing.
The action was brought in August, 1869, for money had and received by defendants for the use of the plaintiff. It was first moved for trial in 1887. When the trial was nearly completed, and in April, 1890, plaintiff by consent of the defendants, amended its complaint and added a seventh cause of action. In this it alleges that the defendants had transactions as stock-brokers, in which they received from one W. H. Sanford, various sums of money as security for services to be rendered or responsibilities to be incurred, or for stocks to be bought or sold by them; that said Sanford paid moneys to defendants in the course of such transactions by his own individual checks, and at other times by means of checks drawn by him upon the plaintiff as its cashier. The plaintiff further alleges that such cashier’s checks could not be rightfully drawn or issued or used by Sanford save in the business of the plaintiff. But notwithstanding this, the defendants received certain cashier’s checks, from Sanford in his individual transactions, and passed the same to his credit. It then sets forth several checks, aggregating $62,521.88, that were received by the defendants. The complaint further alleges that the defendants well knew that Sanford was wrongfully abusing his authority, and was misappropriating moneys of the plaintiff by means of his power and authority as its cashier; and it demands judgment for the said several sums in the various causes of action set forth, aggregating upwards of $139,000, and for interest thereon for upwards of twenty-one years. The answer of the *271 defendants admits the receipts by them of each of the checks stated and set forth in the complaint, and alleges that each check was so received by them in the transactions had for and on account of, and at the request of the plaintiff. They further allege that they never knew or suspected that Sanford was dealing on his individual account until after his defalcation had been discovered, and the president of the plaintiff called upon defendants and so informed them.
It appears from the evidence that when plaintiff’s president called upon defendants he was permitted to see Sanford’s accounts, and informed defendants that Sanford had been speculating on his own account. Shortly after receiving this information from plaintiff’s president, the defendants, discovering a certain balance in favor of Sanford, individually, with other brokers, brought an action against him and recovered about $2,000 by default, upon the theory that the transactions in question were with Sanford individually, and that he was their customer, and not the bank, the plaintiff herein.
The first position taken by the learned counsel for the plaintiff, in support of his claim herein, is that this action by defendants against Sanford, the judgment therein entered, and the enforcement of that judgment against Sanford’s individual property, constituted an election by defendants to consider Sanford as their customer in these transactions; that this election was final and conclusive, and precludes the defendants from insisting in this action that the plaintiff, and not Sanford, was the customer in these transactions in question. The learned counsel claims that this act of defendants established unalterably the important fact in respect of the identity of the party with whom the defendants were dealing; that by such act the defendants proclaimed Sanford to he their customer, the sole, party with whom they were deahng ; and that such act precludes them from contesting *272 that question in this case. We are of opinion that this legal proposition of the learned counsel for the plaintiff cannot be sustained either by principle or by authority The doctrine invoked is “ the election of remedies.” Are the defendants by claiming in this action that the transactions in question were with the plaintiff, violating any of the well-established principles common to questions of election? We think not, for the reason that there has been no election in this controversy. When the plaintiff’s president gave the defendants information that induced .them to proceed against Sanford, there was a debit balance of some two thousand dollars; for this the defendants certainly had a claim either against Sanford or the bank. Plaintiff’s president told defendants Sanford was the man; therefore they sued him, and re-gained a portion of the money. No two inconsistent courses were then opened to the defendants, one of which they took, and the other of which is the course they now seek to take in this action. The doctrine of the election of remedies is not so elastic as to be stretched and made available beyond the point of precluding the defendants, having sued Sanford, from proceeding for the remainder of the balance against the plaintiff. Thus far we think it might be utilized. But it cannot be said to create a remedy in favor of the plaintiff, which did not before exist. The relation between the bank and the defendants was fixed before Sanford ran away, and plaintiff’s president called upon the defendants. If the dealings had been with the bank, nothing that the plaintiff’s president said to the defendants, and no action taken by the defendants in consequence, could change the existing relations. We cannot give our approval to the proposition that the defendants, By their election, not only waived a claim for $2,000, which they might have urged against the bank, but also created a claim in the bank’s favor for the amount of fourteen of these cashier’s checks, selected from the *273 hundred checks that the defendants had received during these transactions. We do not think that any of the numerous cases cited by the learned counsel for the plaintiff satisfactorily support the proposition. They do not go further than to hold that where a plaintiff has two inconsistent remedies and adopts one of them, the same plaintiff cannot have recourse afterwards to the other.
In Fowler v. Bowery Savings Bank, 113 JST. 27, 450, the bank paid money to which plaintiff was entitled to one Finch; on learning this, plaintiff sued Finch for money had and received. Held, by so doing, he ratified the act of the bank in paying Finch, and so could not afterwards disaffirm it and sue the bank. In Tuthill v. Wilson, 90 N. Y., 423, which does not bear on the election of remedies, the court having decided the case on other grounds, it was held that the vendor could not enforce his claim against both the principal when discovered, and the agent who contracted in his behalf. In Conrow v. Little, 115 N. Y., 387, plaintiff finding the vendee had acted fraudulently, sued him as for a debt and seized on attachment the very paper he had sold. Held, that this affirmed the contract of sale, and the defendant, the printer with whom the paper had been left to be printed upon, had and could hold his lien upon it as the vendee’s property. In Powers v. Benedict, 88 N. Y., 605, it was simply held that although an action to re-claim goods sold disaffirmed the contract of sale, yet still, if plaintiff only regains a portion, he may still follow the vendee for the balance of their value. In Moller v. Tuska, 87 N. Y., 166, which was another case where plaintiff sued to regain possession of property rescinding the sale, it was Held that this was an election and prevented their making any claim against the vendee as such ; in this case they followed the property in the hands of a fraudulent transferee from the vendee. In Fields v. Bland, 81 N. Y., 239, it was Held, that the *274 plaintiff, having taken a confession of judgment for goods sold and delivered, the judgment being confessed for the value of such goods, could not thereafter allege that the property, the same goods, belonged to him. In Hughes v. Vermont Copper Mining Co., 72 N. Y., 207, plaintiff brought an action in Vermont claiming damages as for a conversion of his alleged stock, the company having refused to recognize him as a stockholder. Subsequently he brought this action, claiming dividends on the same stock. Held, he had elected his remedy and treated the stock as converted, and he could not now sue, alleging ownership. In Wright v. Wright, 72 N. Y.,149, plaintiff ahd defendant were heirs and next-of-kin of J. of whose estate defendant was administrator. Plaintiff drew two drafts on defendant which defendant paid, and on an accounting as administrator he credited himself with their amount as payments to plaintiff on account of his distributive share. Plaintiff brought this action for an account of the rent of real estate collected by the defendant. Defendant set up the sum paid on these two drafts as a counter-claim. Held, he had elected to consider them as paid out of the personalty and he could not apply them now to the realty. In Dinsmore v. Duncan, 57 N. Y., 573, an action by Express Go. for conversion of a U. S. Treasury note, it was Held, that an indorsement by the owner to the secretary of the treasury for redemption destroyed its negotiability. That is all there is in this case—the doctrine of election is discussed by Dwight, Commissioner, and holds that the endorsement was an election to convert the note into bonds so that its negotiability was destroyed. In the case of Morris v. Rexford, 18 N. Y., 552, an action for goods sold and delivered, plaintiff had before this suit brought an action of replevin and retaken the goods. Held, this was an election of his remedy and the present action could not be maintained. In Thompson v. Fry, 51 Hun, 296, a case submitted under section 1279 of the Code, *275 the controversy was whether plaintiff, as assignee under a voluntary assignment in Ohio, was entitled to certain goods which had subsequently been attached by the defendant. Defendant had proved his claim under the assignment. Held, that he, at least, had accepted and was bound by the assignment.
It will be seen that none of the cases above referred to, cited by the counsel for the appellant, sustains the proposition which he seeks to establish in this case.
This question being disposed of adversely to the plaintiff, it remains to be seen whether or not the plaintiff established by the original facts that defendants had been dealing with Sanford as an individual. We think the findings of fact by the learned referee are amply supported by the evidence and fully warrant the decision he made. There are no exceptions to the admission or exclusion of evidence. The referee’s conclusions upon the whole case, and the judgment entered in pursuance thereof, are correct.
The judgment appealed from is affirmed, with costs.
Freedman, P. J., and Dugro, J., concurred.